Filed 11/19/13  P. v. Barrientos CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANDREW BARRIENTOS,<br><br>        Defendant and Appellant. | A134147<br><br>(Alameda County<br> Super. Ct. No. 165033 A) |

A jury convicted defendant Andrew Barrientos of attempted murder of a police officer, among other crimes. (Pen. Code, §§ 187, 664.)[1] Defendant is serving a life sentence in prison. He appeals upon contentions that the trial court erred in instructing the jury on the use of gang evidence and in admitting gang evidence. He also contends there is insufficient evidence to support the jury's finding that his firearm possession was gang related. We address these contentions in the discussion that follows and shall affirm the judgment.

**Statement of Facts**

Defendant is a self-identified member of the Decoto gang, a Norteño subset. On April 7, 2010, defendant drove through a street intersection marked with a stop sign without coming to a full stop. A police officer recognized defendant as the driver and a fellow gang member as a passenger. The officer activated his vehicle's lights and siren to make a traffic stop. Defendant accelerated to 60 miles per hour, twice the speed limit.

---

[1] All further section references are to this code except as indicated.

1

With the officer in pursuit, defendant ran a red light, veered into oncoming lanes of traffic and narrowly missed colliding with several cars. Concerned with public safety, the officer abandoned his pursuit. A warrant for defendant's arrest was issued for felony reckless driving while fleeing a police officer. (Veh. Code, § 2800.2.)

Defendant's girlfriend urged him to surrender to the police and, when he did not, refused to let him take the couple's child from her house for fear the baby's life would be endangered. Defendant sent a series of threatening text messages to his girlfriend. Defendant threatened to cut her throat, massacre her family and burn down her house. The girlfriend responded by threatening to turn him in to the police. Defendant replied, "Call the cops. I got a vest and two pistols on me" and "Tell them I am going all head shots."

On August 13, 2010, defendant was a passenger in his girlfriend's car when they became embroiled in an argument. Defendant "pulled his gun out," "cocked it back" and threatened to kill her. The girlfriend stopped the car and, after more heated words were exchanged, defendant "flashed" the gun and ran off. Later that day, they spoke on the telephone and defendant accused his girlfriend of "snitch[ing]" on him. He told her she "was going to pay" and that the police "are not taking him down." The girlfriend was "in fear of [her] life" and reported the threats to the police. She gave Officer Todd Young of the Fremont Police Department a location in Oakland where she believed defendant was staying. Young is with a regional task force investigating gang crimes.

On August 27, 2010, Young and another task force officer, Eric Tang, went to the Oakland location defendant's girlfriend identified. The officers intended to conduct surveillance. They were in plain clothes and an unmarked car. Young was wearing jeans, a tee shirt and a "tactical belt" with a handgun in a holster at his hip. His badge was on a chain around his neck, tucked underneath his tee shirt.

Three men in hooded sweatshirts standing on the sidewalk started to walk toward a car defendant was known to use. Young drove closer to see if defendant was one of the men. Young recognized defendant, decided to arrest him and pulled in to block defendant's car from leaving. Young removed his badge from underneath his tee shirt to

2

identify himself as a police officer. Young stepped out of his car and looked at defendant across the hood. Defendant looked at Young and started running. Young testified that defendant took only a few steps before Young twice yelled "police," saying the word "as loud as I could." Tang corroborated Young's account, testifying that he "heard Officer Young yell 'police' twice." A microphone array used by law enforcement to detect gunfire on Oakland's streets recorded the incident and confirms that Young twice shouted "police."

Young ran after defendant on a parallel route to try to head him off. Defendant looked "right at" the officer, turned a corner and kept running. Young pursued him. Defendant slowed down, looked back over his shoulder and started shooting. A bullet hit Young in the hip area, and defendant kept firing. Young raised his gun and returned fire. Tang ran up and the two officers shot at defendant. Defendant ran away. Young was critically injured and almost died. The officer underwent multiple surgeries and has lasting nerve damage to his leg.

After shooting Young, defendant ran four blocks to a grocery store parking lot. David Ferreira was near his parked car when he saw defendant run toward him with a gun. Ferreira testified that defendant was wearing a red canvas "Cholo belt" like Norteños wear. Ferreira was familiar with Norteño dress because his brother "used to run around with the Norteños" and wore "the same belt." Ferreira got in his car, put it in reverse and started backing out of the driveway. Defendant came to the driver side window and pointed his gun at Ferreira. Ferreira ducked down and "slammed on the gas." Defendant fired a shot at Ferreira. The window shattered and glass cut Ferreira's face but he managed to drive away.

Melvin Johnson was about to drive away from the grocery store when he saw defendant trying to get into Ferreira's car, then heard a gunshot. Johnson put his car in reverse and was trying to drive away when defendant shot out his front passenger window. Defendant came to the driver's side window, pointed a gun at Johnson and said, "get the fuck out of the car." Johnson replied "take the car, just don't shoot me" and got out of the car. Defendant took Johnson's car and drove away.

A few minutes later, defendant called his mother and told her: "I'm so sorry. I'm so sorry. I fucked up." His mother asked "what'd you do" and defendant replied "I shot a police officer." The police found Johnson's vehicle abandoned in a known gang area of Hayward. The next day, defendant was apprehended at the United States/Mexico border in a parking lot used by pedestrians to cross into Mexico. Defendant had a gun in his waistband. It was the same gun used to shoot Officer Young. The gun was fitted with a high capacity magazine that holds 33 cartridges.

Detective Andrew Gannam with the Southern Alameda County Crimes Task Force testified as a gang expert. His testimony was founded on his personal experience as a patrol officer, reports of other officers, and court records. He testified to the rivalry between Sureño and Norteño street gangs and described their history, criminal activities, and symbols.

The Decoto gang is a Norteño affiliate located in Union City. Gannam estimated that Decoto has about 250 members. He testified that Decoto's primary activity is the commission of violent crimes, including assault, carjacking, and shooting at occupied vehicles. He described three recent incidents in which Decoto members were convicted of violent crimes.

Gannam testified that defendant is a Decoto gang member. Gannam noted that defendant identified himself as a Decoto when contacted by officers on the street and when booked in jail on two separate occasions. Defendant has several gang-related tattoos, including "Decoto" on one forearm and "Gangsta" on the other forearm. When he was arrested, defendant was wearing pants outlined in red and a red belt with 14 on the buckle. The color red and the number 14 are symbols of the Norteños. Photographs depict defendant with fellow gang members, including Rene Montes de Oca who was with him on the day of the shooting. In the photographs, defendant is "throwing up gang signs" with his hands. Defendant makes gang signs even in family photographs; in one photograph he is "throwing the N hand sign in front of his mother's face."

Gannam said "Firearms are very important to the culture of Decoto. It is very common for Decoto members to have firearms. Very common for them to have them in

4

their households, hide them in their vehicles, keep them on their person when they are out on the street. And they do this again because Decoto is a violent gang . . . involved in a fair amount of gun violence. That's kind of a tool of the trade, something that they use continually." Gannam testified that "when an individual gang member is carrying a gun, it is actually the gang's gun. It is not just his gun. The gun can be lent out and oftentimes is lent out to other gang members to go commit gang-related crimes." Gannam said "the possession of these firearms leads to the reputation of the individuals possessing them, but also to the gang because victims, witnesses, rival gang members, individuals who live in the Decoto neighborhood who are not gang related, know that Decoto possesses these guns and know that they use firearms . . . [so the] level of fear and respect is going to rise [and] Decoto's gang is going to get the reputation and it has the reputation of being a violent gang that possesses firearms and is not afraid to use them."

Gannam described the Decoto gang's "very serious hostility toward law enforcement." He said killing a police officer is seen by gang members as "one of the most respected highest crimes that you can commit." Gannam testified, "an individual who attacks a police officer has shown that he is the most down for the gang and gets the most respect from his fellow gang members for doing so."

The Decoto often use graffiti to threaten police officers, Gannam said. About sixteen months before Officer Young was shot, graffiti in the center of the Decoto District said "187 UCPD it is coming to you soon." Gannam explained that 187 is the Penal Code section for murder and UCPD stands for Union City Police Department. He translated the graffiti as "murder police. It is coming to you soon." Less than two weeks after Officer Young was shot, the police discovered graffiti near the main entrance to Union City and the Decoto neighborhood saying "fuck Officer Young" and "free Dough Boy," which is defendant's nickname.

Defendant's attorney argued to the jury that the shooting was done in self-defense or a mistaken belief in the need for self-defense. Defense counsel noted that the police officers were in an unmarked car and plain clothes, and asserted: "when you're swooped down in Oakland, even in broad daylight, you don't stop and check the dude out when he

5

has got a gun." Counsel argued that defendant may have thought the police were rival gang members, remarking that Officer Tang could have been mistaken for "an Asian Crip." Counsel argued defendant was justified in shooting even if he knew Tang and Young were police officers. Counsel noted that the shooting occurred when Oscar Grant was in the news (Grant was fatally shot by a transit officer) and suggested defendant may have feared the officers would kill him even if compliant. "Cops can have a license to kill. Especially someone as despicable as a gang member." Counsel said the shooting was "a split second reaction" done for self-preservation, not to advance the interests of the Norteños. "He didn't stop to think, will this look good on my resume as a Norteño if I do this? He didn't stop to think, can this give me stories to brag about? He ran out of fear of his life; nothing more, nothing less."

## Verdict and Sentencing

The jury found defendant guilty of attempted murder of Young, whom defendant knew or should have known was a peace officer. (Count One; § 187, subd. (a), 664, subd. (e).) The jury also found defendant guilty of assault with a firearm upon a peace officer. (Count Two; § 245, subd. (d)(2).) On each of these counts, the jury found true several firearm and bodily injury enhancements (§§ 12022.5, subd. (a), 12022.7, subd. (a), 12022.53, subds. (b), (c), (d)) but rejected allegations that the crimes were intended to benefit a street gang. (§ 186.22, subd. (b)(1).)

The jury found defendant guilty of carjacking Johnson and attempted carjacking of Ferreira. (Counts Three & Five; §§ 215, subd. (a), 664.) The jury found true several firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c)) but rejected allegations that the crimes were intended to benefit a street gang. (§ 186.22, subds. (b)(1), (b)(4).) The jury also found defendant guilty of two counts of shooting at an occupied motor vehicle. (§ 246.)

Defendant was found guilty of carrying a concealed firearm on his person (Count Seven; § 12025, subd. (a)(2)) and carrying a loaded firearm in a city (Count Eight; § 12031, subd. (a)). As to these counts, the jury found true allegations that the crimes were intended to benefit a street gang. (§ 186.22, subd. (d).)

6

Defendant was found guilty of assault with a firearm upon his girlfriend (Count Nine; § 245, subd. (b)) and making criminal threats to her (Count 10; § 422). The jury found defendant personally used a firearm in committing the crimes. (§ 12022.5, subd. (a).)

The court sentenced defendant to an indeterminate life term for attempted murder of a peace officer, plus an additional term of 25 years to life for personal use of a firearm resulting in great bodily injury. Defendant was sentenced to a consecutive term of 36 years and 6 months on the remaining crimes.

## Discussion

The court properly instructed the jury on the limited use of gang evidence

Defendant objects to one portion of a standard jury instruction on the limited use of gang evidence. (CALCRIM No. 1403.) The standard instruction cautions jurors to consider evidence of gang activity for only limited, specified purposes. The form instruction lists several possible purposes for the evidence. Depending on the facts of a particular case, gang evidence may be relevant to prove intent to benefit a gang, motive, self-defense, heat of passion or witness credibility. Court and counsel select the relevant provisions to include among those listed in the form instruction.

Defendant challenges inclusion of self-defense in the instruction administered here. At the prosecutor's request, the court instructed the jury as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements and special circumstance allegations charged; [¶] OR [¶] The defendant had a motive to commit the crimes; [¶] OR [¶] *The defendant actually believed in the need to defend himself.* [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. [¶] You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." (CALCRIM No. 1403, italics added.)

7

As a preliminary matter, the Attorney General argues defendant forfeited his challenge to the inclusion of self-defense in the jury instruction by failing to raise the issue below. We agree. Defendant's trial counsel did not object to inclusion of self-defense among the purposes for which gang evidence could be considered. Defense counsel objected generally to "all gang enhancement instructions" on the stated basis that they were unsupported by the evidence. Counsel maintained the evidence established that all charged crimes "are clearly self-defense and self-preservation, and not [committed] for any gang purposes." Counsel did not request refinement of CALCRIM No. 1403 to remove self-defense from the list of permitted uses of gang evidence and, in fact, emphasized the relevance of self-defense to the issues being submitted to the jury. Defendant forfeited the claim that the instruction wrongly listed self-defense among the available uses of gang evidence.

In any event, defendant's challenge to the jury instruction is meritless. CALCRIM No. 1403 is an accurate statement of law on the limited admissibility of gang evidence: "It states in no uncertain terms that gang evidence is not admissible to show that the defendant is a bad person or has a criminal propensity" and allows such evidence to be considered for only limited purposes. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168.) Motive and actual belief in the need to defend oneself are permitted purposes and properly included in the instruction when put in issue by the facts of the case.

The facts here supported the instruction. The defense argued self-defense or a mistaken belief in the need for self-defense and founded its position on defendant's gang affiliation. Defense counsel noted that the police officers were in an unmarked car and plain clothes and told the jury defendant may have thought the police were rival gang members out to kill him, remarking that one of the officers could have been mistaken for "an Asian Crip." The defense also argued that police kill innocent civilians like Oscar Grant and that defendant, as a gang member "despi[sed]" by the police, may have believed he was at risk of being unlawfully shot by the officers. The prosecution disputed these claims and maintained that defendant knew Young was a police officer attempting a

lawful arrest and shot the officer because gang members hate the police and gain respect by attacking them. As the Attorney General rightly observes, "given the charges and special allegations, the defenses, and the theory of each side's case, the gang evidence was clearly probative to both sides on the issues of [defendant's] intent, purpose, knowledge, motive, and whether [defendant] actually believed in the need for self-defense."

Defendant does not deny he relied upon a theory of self-defense at trial but argues the only question presented was whether he knew Young was a police officer and gang evidence is irrelevant to that question. Defendant argues: "Evidence that Decoto gang members were hostile toward police and rewarded with respect members who shot them, had no tendency in reason to prove that [defendant] in fact knew or had reason to know that the armed man dressed in street clothes who charged and then chased him, was a policeman." The argument fails to appreciate the scope of the self-defense theory presented at trial. The defense was not founded on a simple claim of misidentification of Young as a civilian. Defendant argued he mistook Young and his partner as rival gang members intending to kill him or, alternatively, recognized the men as police officers but feared an unlawful attack because the police despise gang members. Under these circumstances, evidence of defendant's gang affiliation, gang rivalries and gang relations with the police were directly relevant to whether defendant actually believed in the need to defend himself when he shot Young.

The jury instruction did not, as defendant contends, invite the "jurors to use the prior bad acts of [defendant] and others to decide if [defendant] subjectively believed in the need to defend himself." The instruction expressly cautioned the jurors that they could consider evidence of gang activity only for limited, specifically stated purposes and "may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." (CALCRIM No. 1403.) We also reject defendant's related contention that "the instruction reduced the prosecutor's burden of proof, violated [defendant's] right to due process and trial by jury." The jury was

9

properly instructed it could consider evidence of gang activity to evaluate whether defendant actually believed in the need to defend himself.

<u>The gang evidence was properly admitted</u>

Defendant argues Detective Gannam's testimony on the history and activities of the Norteño and Decoto gangs should have been excluded because it was hearsay and, as such, violated defendant's right to confront witnesses. Defendant failed to raise this issue in the trial court, thus forfeiting it. (*People v. Riccardi* (2012) 54 Cal.4th 758, 801.) Although forfeited, we also reject defendant's confrontation claim and related due process claim on their merits.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) Under the confrontation clause, testimonial statements of witnesses absent from trial are generally inadmissible when offered for the truth of the matter asserted unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. (*Crawford v. Washington* (2004) 541 U.S. 36, 59.)

A number of courts have held that a gang expert's use of out-of-court statements falls outside the scope of the confrontation clause because the statements are used to show the basis for the expert's opinion and not for their truth. (E.g. *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1208-1210; see *People v. Valadez* (2013) 220 Cal.App.4th 16, 29 [collecting cases].) Defendant disputes the continued validity of these cases given recent suggestions that an expert's use of out-of-court statements may, in certain circumstances, compel the jury to accept the truth of the statements. (*People v. Dungo* (2012) 55 Cal.4th 608, 635 & fn. 3 (dis. opn. of Corrigan, J.).) Defendant claims the statements here were admitted for their truth and notes that CALCRIM No. 1403 allowed the jury to consider Gannam's testimony for substantive purposes in evaluating whether defendant had a motive to commit the crimes or acted in self-defense. We need not resolve the unsettled question of whether the gang expert evidence was offered for its truth.

10

Assuming the out-of-court statements on which Gannam relied when testifying about gang history and activities were offered for their truth, as defendant contends, the statements were not testimonial. "[T]estimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo, supra,* 55 Cal.4th at p. 619.) Gannam spoke with police officers and gang members and overheard conversations between gang members. The statements Gannam heard in these encounters were not formal nor elicited to target specific individuals for prosecution.

A recent case addressed the same issue presented here and concluded that "general background information" an officer "obtained from gang members, other officers, and written materials on the history of the . . . gangs plainly does not qualify" as testimonial. (*People v. Valadez, supra,* 220 Cal.App.4th at p. 35.) The court held that a gang expert's reliance on out-of-court statements of this nature does not violate a defendant's confrontation clause rights. (*Ibid.*) We agree.

Moreover, even if Gannam recounted out-of-court testimonial statements for their truth, there was no prejudice. The jury undoubtedly would have convicted defendant of attempted murder and assault on a police officer absent the challenged evidence. Defendant argues that Gannam's testimony about violent gang culture and gang hostility toward the police was used "to persuade the jury that [defendant] knew Officer Young was a policeman when he fired the shots" and "the shooting was not justified by self-defense." The evidence on these points is overwhelming, independent of Gannam's testimony. There was undisputed evidence that Young loudly declared himself a police officer when he confronted defendant and defendant told his mother, minutes after the shooting, "I fucked up. . . . "I shot a police officer." Any error in admitting Gannam's testimony was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 23-24.)

11

<u>Substantial evidence supports the jury's finding that defendant's firearm possession was intended to benefit a street gang</u>

As noted above, the jury found defendant guilty of carrying a concealed firearm on his person (Count Seven; § 12025, subd. (a)(2)) and carrying a loaded firearm in a city (Count Eight; § 12031, subd. (a)).The jury found true allegations that the crimes were intended to benefit a street gang. (§ 186.22, subd. (d).) The court stayed sentence on these counts. (§ 654.) Defendant contends there is insufficient evidence to support the jury's finding that the firearm possession counts were gang related.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence - that is, evidence that is reasonable, credible, and of solid value - from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*Ibid.*)" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Section 186.22, subdivision (d) provides an enhanced sentence for "[a]ny person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of or in association with, any criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." A similar enhancement applies to felonies (§ 186.22, subd. (b)(1).)

There was substantial evidence that defendant's firearm possession was gang related. Defendant was an admitted gang member, wearing gang clothing and in the company of a fellow gang member when he possessed the gun. Officer Gannam testified that "[f]irearms are very important to the culture of Decoto" and that "when an individual gang member is carrying a gun, it is actually the gang's gun. It is not just his gun."

12

Gannam said gun possession promotes the reputation of the gang "because victims, witnesses, rival gang members, [and] individuals who live in the Decoto neighborhood who are not gang related, know that Decoto possesses these guns . . . [so the] level of fear and respect is going to rise" and the gang achieves "the reputation of being a violent gang that possesses firearms and is not afraid to use them." "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a criminal street gang' within the meaning of section 186.22(b)(1)." (*People v. Albillar, supra,* 51 Cal.4th at p. 63.) The record supports the gang enhancements.

## Disposition

The judgment is affirmed.

_____
Pollak, J.


We concur:


_____
McGuiness, P. J.


_____
Siggins, J.